No. 24-1009

_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____


UNITED STATES OF AMERICA,
Appellee

V.

JAMES WARD JACKSON,
Appellant


_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
_____


# BRIEF FOR APPELLANT

John L. Calcagni III
Law Office of John L. Calcagni III, Inc.
72 Clifford Street, Suite 300
Providence, RI 02903
Phone: (401) 351-5100
Fax: (401) 351-5101
jc@calcagnilaw.com

# TABLE OF CONTENTS

Table of Authorities ……………………………………………………………...iii

Jurisdictional Statement …………………………………………………………....1

Issues Presented for Review …………………………………………………………1

Statement of the Case …………………………………………………………………...2

    A. Procedural History ……………………………………………………………2
    B. Facts …………………………………………………………………………...3
        (1) The Affidavit Supporting the Search Warrant …………………………3
        (2) The Attachments to the Motion to Reconsider …………………………6
    C. Rulings of Trial Judge on the Motions to Suppress and to Reconsider …….9

Summary of Argument …………………………………………………………...10

Arguments ……………………………………………………………………..13

  I.  The search warrant for the church and rectory violated the particularity
     clause of the Fourth Amendment, making the search executed under its
     authority a general search prohibited by that amendment. ………………...13

    A. The place to be searched …………………………………………………15
    B. The items to be seized …………………………………………………27
    C. First Amendment concerns ……………………………………………… 33
    D. Alternative solutions …………………………………………………...36

  II.  The objective good faith doctrine does not apply because the warrant is
      facially deficient in its failure to particularize the place to be searched
      and the things to be seized, and is so lacking in indicia of probable cause
      as to render official belief in its existence entirely unreasonable. ………....40

Conclusion ………………………………………………………………………..45

Statement of Compliance with Fed. R. App. P. 32(a) ……………………………...46

Certificate of Service ………………………………………………………………..47

# TABLE OF AUTHORITIES

## Cases

*Andresen v. Maryland,* 427 U.S. 463 (1976) …………………………….....35-36

*Brown v. Illinois*, 422 U.S. 590 (1975) ………………………………………...41

*Camara v. Municipal Court of City and County of San Francisco*,
     387 U.S. 523 (1967) …………………………………………………......14-15

*Carpenter v. United States*, 138 S.Ct. 2206 (2018) …………………………....36

*Commonwealth v. Martinez,* 476 Mass. 410, 71 N.E.3d 105 (Mass. 2017) ……...39

*Davis v. United States*, 564 U.S. 229 (2011) …………………………………..44

*Frank v. Maryland*, 359 U.S. 360 (1959) ……………………………………...34

*Groh v. Ramirez,* 540 U.S. 551 (2004) ……………………………… 14, 15, 41, 43

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) …………………………………....43

*Herring v. United States*, 555 U.S. 135 (2009) ………………………………..44

*Illinois v. Gates,* 462 U.S. 213 (1983) ……………………………………....41

*In re Bittorrent Adult Film Copyright Infringement Cases*, 296 F.R.D. 80
     (E.D.N.Y. 2012) …………………………………………………….27, 32

*Malley v. Briggs*, 475 U.S. 335 (1986) ……………………………………….. 43

*Marcus v. Search Warrant*, 367 U.S. 717 (1961) ……………………….. 33, 34, 35

*Marron v. United States*, 275 U.S. 192 (1927) ……………………………….13, 27

*Maryland v. Garrison*, 480 U.S. 79 (1987) ………………… 13, 14, 16, 17, 25, 42

*Massachusetts v. Sheppard*, 468 U.S. 981 (1984) ………………………..15, 41, 43

*Rice v. United States*, 24 F.2d 479 (1st Cir. 1928) ………………………………… 28

*Silverman v. United States*, 365 U.S. 505 (1961) …………………………………..24

*Stanford v. Texas*, 379 U.S. 476 (1965) ……………………………………… 14, 33, 34

*Steagald v. United States*, 451 U.S. 204 (1981) ……………………………………..14

*Steele v. United States No. 1*, 267 U.S. 498 (1925) ………………………… 33, 34

*Tynan v. United States*, 297 F. 177 (9th Cir. 1924) …………………………………..19

*United States v. Alexander*, 761 F.2d 1294 (9th Cir. 1985) ……………………… 21

*United States v. Arnott*, 758 F.3d 40 (1st Cir. 2014) …………………………...13

*United States v. Ayers*, 924 F.2d 1468 (9th Cir. 1991) ……………………… 21, 23

*United States v. Bedford*, 519 F.2d 650 (3rd Cir. 1975) ………………………… 19

*United States v. Chadwick*, 433 U.S. 1 (1977) …………………………………...14

*United States v. Darensbourg*, 520 F.2d 985 (5th Cir. 1975) …………………… 20

*United States v. Esters,* 336 F.Supp. 214 (E.D Mich. 1972) ……………………..20

*United States v. Fuccillo*, 808 F.2d 173 (1st Cir. 1993) ……………………….. 41, 43

*United States v. Harris*, 365 F.Supp. 261 (1972) …………………………………...20

*United States v. Harris*, 486 F.2d 1404 (6th Cir. 1973) ………………………… 20

*United States v. Higgins*, 428 F.2d 232 (7th Cir. 1970) ……………......13, 17, 18, 26

*United States v. Hinds*, 856 F.2d 438 (1st Cir. 1988) …………………………… 21

*United States v. Hinton,* 219 F.2d 324 (7th Cir. 1955) …………………….. 17, 18, 26

*United States v. Kearney*, 672 F.3d 81 (1st Cir. 2012) …………………………... 40

*United States v. Klein*, 565 F.2d 183 (1st Cir. 1977) ………………… 15, 28, 29, 33

*United States v. Leon*, 468 U.S. 897 (1984) ……………………… 9, 12, 40, 41, 43

*United States v. Levin*, 874 F.3d 316 (1st Cir. 2017) …………………… 39, 41, 44

*United States v. McLellan*, 792 F.3d 200 (1st Cir. 2015) …………………… 21, 22

*United States v. Monell*, 801 F.3d 34 (1st Cir. 2015) ……………………………..40

*United States v. Ricciardelli*, 998 F.2d 8 (1st Cir. 1993) ……………….... 25, 41, 44

*United States v. Schwinn,* 376 F.App'x 974 (11th Cir. 2010) ……………...21, 22

*United States v. Sklaroff*, 323 F.Supp. 296 (7 D.Fla. 1971) ……………………...20

*United States v. Stanley*, 753 F.3d 114 (3rd Cir. 2014), cert. den. 135 S.Ct. 507…38

*United States v. Tiru-Plaza,* 766 F.3d 111 (1st Cir. 2014) …………………….....13

*United States v. Votteller,* 544 F.2d 1355 (6th Cir. 1976) …………………….18, 19

*United States v. Woodbury,* 511 F.3d 93 (1st Cir. 2007) ………………………… 40

*United States v. Zayas-Diaz*, 95 F.3d 105 (1st Cir. 1996) ………………… 9, 40, 41

## Statutes and Rules

18 U.S.C. § 2252(a)(2) ……………………………………………………...1

18 U.S.C. § 2252(a)(4)(B) ……………………………………………....1

28 U.S.C. § 1291 …………………………………………………………...1

Fed. R. Crim. P. 11(a)(2) ……………………………………………...1, 3

R.I.G.L. § 11-9-1.3 ……………………………………………………...4, 5

**Other**

Fifth Amendment to the United States Constitution ……………………………..34

First Amendment to the United States Constitution ………………………….33, 34

Fourteenth Amendment to the United States Constitution ………………………35

Fourth Amendment to the United States Constitution...13, 18, 24, 30, 33, 34, 35, 44

Searches and Examinations, ATF Order 0 3220.1(7)(d) (Feb. 13, 1997) ………. 43

*stmarypvdri.org* ..……………………………………………………………… 7

## JURISDICTIONAL STATEMENT

Mr. James W. Jackson was indicted on charges of (1) receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2), and (2) possessing child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). (Appendix at p.16, hereinafter App.16). He entered a guilty plea on June 8, 2023, to count one and the government dismissed count two. Under Fed. R. Crim. P. 11(a)(2), Mr. Jackson reserved the right to appeal his conviction on the issue of whether the trial judge erred when he denied the motion to suppress the evidence against him, which was seized pursuant to a search warrant. The District Court sentenced Mr. Jackson on December 13, 2023, to imprisonment for 72 months, and, thereafter, to supervised release for five years. Final judgment was entered on December 21, 2023. (App. 20). Mr. Jackson filed a notice of appeal on December 22, 2023. (App.28-29). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the search warrant for the church and rectory violated the particularity clause of the Fourth Amendment, making the search executed under its authority a general search prohibited by that amendment.

2. Whether the search warrant is facially deficient in its failure to particularize the place to be searched and the things to be seized, and the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, making application of the objective good faith doctrine erroneous.

# STATEMENT OF THE CASE

## A.  Procedural History

Prior to his guilty plea, Mr. Jackson filed a motion to suppress the evidence against him obtained from execution of a search warrant for St. Mary's Catholic Parish, 538 Broadway, Providence, RI, including the church and the separate rectory building, which contains multiple offices and residences.  During the execution of the warrant on October 30, 2021, law enforcement agents seized and searched the contents of an external computer hard drive, leading to Mr. Jackson's arrest.

The Defense motion to suppress argued the insufficiency of facts established by the affidavit (Addendum at p.19, hereinafter Add.19) for the search warrant, which stated the owner or keeper of the property to be searched was "unknown," and that the search included "spaces located on the premises used by residents." (Add.18).  As recognized in the warrant affidavit, the church rectory contained more than one resident.  Defense counsel argued that the particularity clause with regard to the place to be searched, as well as the items to be seized (inasmuch as the warrant covered all computers, cellphones, and electronic devices belonging to all residents), was not satisfied on the face of the warrant.  Also, since there were multiple residents, each of whom might have computers, cellphones, and electronic devices, there was no probable cause to search all residences or to seize all

electronic devices belonging to all residents.  Without a hearing or oral argument, the Court issued a Memorandum and Order denying the motion on November 14, 2022.  (Add.2).

Thereafter, the Defense filed a Motion to Reconsider on February 2, 2023, which was denied by via Text Order on February 22, 2023. (Add.16).  Following his guilty plea, Mr. Jackson filed the instant appeal, under his reservation of the right to do so pursuant to Fed. R. Cr. P. 11(a)(2) (App.28-29).

## B.  <u>Facts</u>

The source of facts stated herein are:  (1) the affidavit of Detective Corporal Stephen Evans of the East Providence Police submitted in support of the search warrant executed on October 30, 2021 (Add.20), and (2) the affidavits, photographs, and church bulletin attached to the Motion to Reconsider.

### (1) The Affidavit Supporting the Search Warrant

Detective Evans was assigned to the Internet Crimes Against Children Task Force.  In his general investigation, he learned that a device located in Providence, connected to a particular Internet Protocol (IP) Address, was on a peer-to-peer file-sharing network on September 4, 2021, at 11:11:56 UTC (6:56 a.m.) sharing files of suspected child pornography. (Add.20).  At such time, seventy-one (71) files of suspected child pornography were downloaded.  Det. Evans viewed some of those

files and concluded they were consistent with the definition of child pornography, as defined by R.I.G.L. § 11-9-1.3 (Add.20).

The owner of the IP address was Verizon Fios in New Jersey. Det. Evans sent legal process to Verizon, which responded that the IP address was assigned to St. Mary's Church of 538 Broadway, Providence, RI. The named subscriber for the internet service was Claire Gruneberg, the church's bookkeeper. (Add 22). Mr. Jackson was the pastor of the church at the time of the search. (Add. 36, 39). A traditional Wi-Fi router can broadcast an internet signal for 150 feet or more, which allows all within that distance access to the internet. (Add.22). To determine who was using the internet service to download the files in question, Det. Evans decided he needed to review both "any and all" digital media and written documentation within reach of the church's Wi-Fi internet signal. (Add. 24).

During October 2021, Det. Evans went to the church address and observed several buildings, including the stone church and a yellow rectory building that housed church offices and residences for the parish priests. While standing in proximity to the property, Det. Evans detected the locked internet service assigned to the church, as anyone could if within the Wi-Fi router signal range. (Add.22).

When a user is connected to a peer-to-peer file sharing network and is accessing files identified as child pornography, Det. Evans is notified. As such, he learned that a computer or other digital device was using the church's internet

service to access a file-sharing address on Sunday, September 26, 2021, at 5:32

p.m.; Friday, October 15, 2021, at 3:12 p.m.; and Sunday, October 17, 2021, at

3:58 p.m.  The October 15 connection revealed nine files of suspected child

pornography, a portion of which were viewed by Det. Evans.  He believed several

were consistent with the definition of child pornography in R.I.G.L. § 11-9-1.3.

The peer-to-peer connections appeared to occur during off-hours of church

activities. (Add.23).

The search warrant (Add. 19) described the place to be searched as:

> The premises located at 538 Broadway, Providence,
> Rhode Island 02909.  Said premises is described as a
> stone church with "St. Mary's Catholic Parish" affixed to
> a sign in the front of the building.  The search will
> include exterior buildings on the property to include the
> detached yellow building commonly known as the
> rectory.  The search will include storage spaces located
> on the premises used by residents.

The "property or articles" to be seized were described (Add.19) as:

> Computer hardware, computer software, mobile devices,
> and portable digital storage devices, to include the
> contents therein.  Additionally, any and all computer-
> related documentation, records, documents, materials,
> proceeds, passwords or other data security devices
> related to the possession and transfer of child
> pornography.  Refer to Attachments "A" and "B"
> attached hereto and made a part hereof.

The two-page Attachment A defined "computer hardware," "computer

software," "computer-related documentation," "records, documents, and

materials," and "passwords and other data security devices" in overwhelmingly broad terms that included an exhaustive list of all possible digital and written materials.  (Add.26-27).

Another two-page Attachment B explained that because of the "volume of evidence" involved and the "technical requirements" for thoroughly searching it, "which can take weeks or months," all the items listed would have to be seized and the contents searched thereafter. (Add.28-29).

The "Name of owner, or keeper, thereof" was listed as "Unknown." (Add.19).

**(2) Attachments to the Motion to Reconsider**

In an attempt to show that the original decision denying the motion to suppress was based on a manifest error of law or was clearly unjust, Defense Counsel filed a Motion to Reconsider in which facts regarding the occupancy and configuration of the rectory, missing from the warrant affidavit, were presented in two affidavits of the current pastor and an associate priest (Add.36-41), who "reviewed the [attached] photos and attest[ed] that they are fair and accurate depictions of the interior and exterior of the St. Mary's Church property located at 538 Broadway." (Add.37,40).  The photos represent the physical structures and condition of the church property as they existed in October 2021 (Add.36).

St. Mary's Church is a large, old church, with the current church building completed in 1869. (Add. 35-36, 39).  A recent weekly Church Bulletin (Add. 30-33), which can be found in the church and also on its website, *ww.stmarypvdri.org*, contains information about the priests and administrators who serve the church, and the church schedule, including masses, confessions, various websites, and other information.

Next to the church is the rectory—a three-story, yellow, 5700 square feet building, which also has a basement. (Add. 35-36, 39).  As explained in the affidavits of the pastor and associate priest (Add. 37, 40):

> 7.  The first floor of the rectory contains common areas and offices. When you enter the rear entrance of the rectory, there is a hallway which runs down the middle of the floor to the front entrance, which faces Broadway.  From the rear entrance and on the left, there is a communal kitchen.  Directly across the hall on the right is an office.  As you proceed further down the hall, there are two additional offices on the left, which are adjacent to one another. Across from those offices and on the opposite side of a staircase that runs through the middle of [the] rectory is an open dining room and living room area, which is common space for the residents of the rectory.

> 8.  The second floor primarily consists of residential living areas for the priests.  Each priest has a private bedroom.  The pastor's living area is the largest, as it has its own bathroom, as well as a private office, while the other residents share a common bathroom, also located on the second floor.  The pastor's room is under lock and key, at his discretion.  The second floor also has a common sitting room with a television that is used by the priests during their free time.

9. The third floor and basement of [the] rectory are presently used for storage.

Photographs of the second-floor attached to the Motion to Reconsider included those showing the pastor's private areas (bedroom, work area, and bathroom). (Add. 42, App.46-48). The private bedrooms and work areas for two associate priests are shown in other photos. (App. 50-51). A photo of the shared living space for the priests was also included. (App. 44). There are also photos of the second-story hallway, with a work area at the end, and the stairway to the third-floor storage areas. (App. 48-49). There was no photo of the bathroom shared by the other two priests in residence.[1]

Other photographs attached to the Motion to Reconsider showed exterior views of the rectory (App. 31-33), as well as first-floor photos of the central hallway (App.34-35), shared kitchen (App. 36), office for the church administrator (App.37), views of the adjoining dining and living areas (App. 38-41), and two offices for priests (App. 42-43).

## C. Rulings of Trial Judge on Motion to Suppress

After summarizing the facts in the affidavit for the search warrant and the positions of the prosecution and defense, the trial judge denied the motion, explaining (Add. 11):

---

[1] At the time of the visit to take the photos, the bathroom was occupied.

The limitations of the record in the present case make difficult the determination of which of the preceding paradigms [single-family dwellings as opposed to multi-unit dwellings] is applicable here. Both parties and the search warrant itself refer to the fact that multiple people live and work within the rectory and that it contains storage areas. … The affidavit accompanying the Complaint notes that Defendant had a bedroom and an adjoining office and references a "dining room/common area." … A more detailed description of the building, however, is not provided. From these descriptions, it seems that the rectory does not possess the hallmarks of multi-unit dwellings such as a separate entrance, separate doorbell or mailboxes, and independent living space, and would be best characterized as a single-family residence, making the description in the warrant sufficiently particular, but this cannot be conclusively determined based on the available information.

The trial judge, engaging in a "*Leon* bypass" of the merits, *United States v. Zayas-Diaz*, 95 F.3d 105, 112-113 and n.8 (1st Cir. 1996), then found (Add. 11-12):

Even assuming that the warrant lacked sufficient particularity in its description of the place to be searched, however, there is no basis for suppressing the evidence because the officers acted in good faith on the judge's determination that the warrant was sufficient.

Thereafter, Defense Counsel filed a Motion to Reconsider. On February 22, 2023, the trial judge entered the following order denying the motion (Add. 16):

Text Order denying Defendant's … Motion to Reconsider Defendant's Motion to Suppress. Motions for reconsideration are appropriate where the moving party presents newly discovered evidence, where there has been an intervening change in the law, or where the movant can demonstrate that the original decision was based on a manifest error of law or was clearly unjust. …

Here, Defendant argues that the third scenario applies, suggesting that the additional facts provided in support of the motion to reconsider clarify that the building is best characterized as a multi-unit dwelling and the warrant was thus insufficiently particularized, and that the good faith exception to the warrant requirement is not applicable because of the warrant[']s facial deficiencies. … Defendant's arguments are unavailing. As discussed in the Court[']s previous Memorandum and Order, …, even if the rectory is best characterized as a multi-unit dwelling, the warrant in this case "was not so 'facially deficient … that the executing officers [could not] reasonably presume it to be valid,'" … and the officers "reasonably believed that the search they conducted was authorized by a valid warrant," … leaving no basis for suppression. Accordingly, Defendant's … Motion to Reconsider is DENIED. [citations omitted]

## **SUMMARY OF ARGUMENT**

Det. Evans received information that child pornography was downloaded from an IP address that was assigned to a church parish, which, in addition to the church, included the rectory building that contained offices and residences of several priests. He determined the internet service covered the entire parish and that the internet bill was paid by the church bookkeeper. After he learned of three additional dates and times when the IP address was used to download child pornography, Det. Evans sought a search warrant for the church and rectory without showing any attempt to narrow down the visitor, employee, or priest who might have used the internet address for this illicit purpose.

Although he knew there was more than one resident priest in the rectory (the search warrant referred to "residents"), Det. Evans did not mention any additional investigation to narrow the search to a specific resident or electronic device. The target of the search was listed as "unknown." The items to be seized and thereafter searched for "weeks or months" for the existence of child pornography, included all computers, cellphones, and electronic devices belonging to the multiple residents and administrators located on the property.

The result of Det. Evans' efforts was a general warrant allowing the search of all offices and residences of multiple priests and administrators, and the seizure and search of all digital devices belonging to multiple parties, not limited in any way to a potential suspect or a specific electronic device. Such a warrant does not meet the particularity requirement of the Fourth Amendment, nor does it provide probable cause to search each residence or to seize all devices belonging to each resident. Instead of a search based upon probable cause, the warrant authorized a prohibited general exploratory search to obtain probable cause to effectuate an arrest of someone.

Also, if the common living situation of priests residing in rectories allows a lesser governmental showing of particularity or probable cause to search their private residences, then First Amendment protections of freedom of religion, the right to assemble, and freedom of speech are also diminished. The police should

have engaged in additional investigation to narrow the residences to be searched and the items to be seized by listing a suspect or an electronic device as the object of the search or seizure.

The District Court's determination that the *Leon* objective good faith doctrine applied to forgive the constitutional blunder was erroneous. Two situations recognized in *Leon* where the objective good faith doctrine does not apply exist in this case. The first is where the warrant is facially deficient in its failure to particularize the place to be searched and things to be seized. A reasonable officer should have recognized that the particularity clause, required by the Fourth Amendment, was not met by such a broad search and seizure.

The second involves the existence of probable cause for the search and seizure allowed by the warrant. A police officer's belief in the existence of probable cause within the affidavit for a search of all residences in the rectory and a seizure of all electronic devices belonging to each of the multiple parties located therein would be entirely unreasonable.

## ARGUMENT

### I.    THE SEARCH WARRANT FOR THE CHURCH AND RECTORY VIOLATED THE PARTICULARITY CLAUSE OF THE FOURTH

**AMENDMENT, MAKING THE SEARCH EXECUTED UNDER ITS AUTHORITY A GENERAL SEARCH PROHIBITED BY THAT AMENDMENT.**

When reviewing the denial of a motion to suppress, the District Court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo. *United States v. Tiru-Plaza,* 766 F.3d 111, 114-115 (1st Cir. 2014); *United States v. Arnott*, 758 F.3d 40, 43 (1st Cir. 2014).

The Fourth Amendment to the United States Constitution states that "no Warrants shall issue, but *upon probable cause*, supported by Oath or affirmation, *and particularly describing the place to be searched and the persons or things to be seized.*" (emphasis added). "Probable cause and the particular description of the place to be searched are essential requirements of equal importance." *United States v. Higgins*, 428 F.2d 232, 234 (7th Cir. 1970). As explained in *Marron v. United States*, 275 U.S. 192, 196 (1927): "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

*Maryland v. Garrison*, 480 U.S. 79, 84 (1987), elaborated:

> The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement

ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

*Steagald v. United States*, 451 U.S. 204, 220 (1981), explained the constitutional "objectionable feature" of a general search prohibition:

The general warrant specified only an offense – typically seditious libel – and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched. Similarly, the writs of assistance used in the Colonies noted only the object of the search – any uncustomed goods – and thus left custom officials completely free to search any place where they believed such goods might be. The central objectionable feature of both warrants was that they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home. [citing *Stanford v. Texas*, 379 U.S. 476, 481-485 (1965)].

An additional objective was mentioned in *Groh v. Ramirez,* 540 U.S. 551, 561 (2004):

We have long held, moreover, that the purpose of the particularity requirement is not limited to the prevention of general searches. See *Garrison*, 480 U.S., at 84. A particular warrant also "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States v. Chadwick*, 433 U.S. 1, 9 (1977) (citing *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 532 (1967)) . . .

If the place to be searched or the thing to be seized is not described as commanded by the Constitutional requirement, "[t]he uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988, n.5 (1984) (citing a number of cases including *United States v. Klein*, 565 F.2d 183, 185 (1st Cir. 1977)). See also *Groh*, 540 U.S. at 564.

## A.  The Place to be Searched

Based on information that child pornography was viewed from an internet protocol address assigned to a church parish, which included the church and the rectory used as church offices and residences for several priests, Det. Evans began an investigation.  The only facts he established were that the internet covered the entire parish, and that the internet bill was paid by the church bookkeeper.  The officer failed to narrow down both a potential suspect among the multiple employees and priests who worked and lived there, and the particular residence, among several, to be searched, or the particular items, by owner or location, to be seized.  He should have tried to do so, but no showing was made in the affidavit of any such attempt.  Nor was there any showing or suggestion that any, let alone all, residents and employees were engaged in criminal conduct.

In *Garrison, supra,* the police determined that a man named McWebb was using his apartment on the third-floor of a three-story building to store illegal drugs. The building contained seven apartments. As was documented in the affidavit for the warrant, the officers investigated the records of utilities and the police department, leading to the belief that the third-floor had only one apartment, causing them to describe the place to be searched as the third-floor apartment at that address. During the execution of the warrant, the officers discovered that there were two apartments on the third floor, but not before they located drugs in the apartment of Mr. Garrison. Their search of Garrison's apartment ceased as soon as they recognized that two apartments were on the third-floor.

The Court stated, *Garrison,* 480 U.S. at 85: "[p]lainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant." The Court found that since the officers investigated and, deferring to the finding in the state court, see 480 U.S. 86 n.10, made a "reasonable mistake," and stopped the search when they determined they were in the wrong apartment, there was no constitutional violation. See discussion at 480 U.S. 87-88. In footnote 13 on page 88, the Court stated:

> We expressly distinguish the facts of this case from a
> situation in which the police know there are two

> apartments on a certain floor of a building, and have
> probable cause to believe that drugs are being sold out of
> that floor, but do not know in which of the two
> apartments the illegal transactions are taking place.  A
> search pursuant to a warrant authorizing a search of the
> entire floor under those circumstances would present
> quite different issues from the ones before us in the case.

In *United States v. Higgins*, *supra*, the situation "distinguished" in *Garrison* was presented to the court.  There, verified information from an informant indicated that the defendant would meet customers and accept money for heroin and go to an apartment in the basement of an apartment house and then leave and make delivery.  The building described in the warrant was a three-story building with four apartments on each floor and, in addition, three in the basement.  The warrant authorized the search of "the premises known as basement apartment building at 4432-38 South Calumet Avenue, Chicago, Illinois."  The court, 428 F.2d at 234-235, found it "evident that the officers could not determine from the warrant which apartment was to be searched and that they made the determination by searching all apartments until they discovered the one they were looking for."

The Court cited a case with "closely analogous" facts, *United States v. Hinton,* 219 F.2d 324, 325 (7th Cir. 1955), which stated:

> The showing of probable cause and the particularity of
> the description of the place to be searched are usually
> treated separately, but in view of the problems presented
> by this appeal they must be considered together, for the
> scope of the warrant to search is dependent upon the
> extent of the showing of probable cause to search. …

For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses. Probable cause must be shown for searching each house or, in this case, each apartment. If such cause is shown there is no reason for requiring a separate warrant for each resident. A single warrant may cover several different places or residences in a single building. But probable cause must be shown for searching each residence unless it be shown that, although appearing to be a building of several apartments, the entire building is actually being used as a single unit.

Federal courts have consistently held that the Fourth Amendment's requirement that a specific "place" be described when applied to dwellings refers to a single living unit (the residence of one person or family). Thus, a warrant which describes an entire building when cause is shown for searching only one apartment is void. [citing cases]

The court in *Higgins*, as did the court in *Hinton*, found the warrant did not

meet the requirements of the Fourth Amendment particularity clause and was

fatally defective.

*United States v. Votteller,* 544 F.2d 1355 (6th Cir. 1976), included a review

of cases on the issue of particularity with regard to the place to be searched. There,

the object of the search, *Id*. at 1362, was:

57 Euclid Avenue, Kenton County, Kentucky. A three-story red brick structure, the first floor of which contains the Starlight Bar, 224 Elm Street, Ludlow, Kentucky. This structure also has an entrance onto Euclid Avenue, known as 57 Euclid Avenue. Within this 3-story

> structure is located telephone number 581-8421.  This
> structure is located on the northwest corner of the
> intersection of Elm Street and Euclid Avenue, Ludlow,
> Kentucky.

Following a review of many cases, the Court in *Votteller,* 544 F.2d at 1363, stated: "[w]e find no evidence that the Government agents made any effort to get a more detailed description of the premises to be searched.  Government agents cannot be heard to say that they did not know or that they made an honest mistake in the description."  The court concluded that the search warrant was illegal and void for the failure to accurately describe the premises to be searched.

Several of the cases cited by the Court in *Votteller* shed light on the particularity requirement.  In *United States v. Bedford*, 519 F.2d 650, 654-655 (3rd Cir. 1975), the court said:

> Consonant with the fourth amendment's dictate that
> warrants particularly describe the place to be searched, a
> search warrant directed against an apartment house will
> usually be held invalid if it fails to describe the particular
> apartment to be searched with sufficient definiteness to
> preclude a search of other units located in the building
> and occupied by innocent persons.

And in *Tynan v. United States*, 297 F. 177, 179 (9th Cir. 1924), it was stated: "No doubt a general search warrant for an entire building, . . . occupied by different families or different tenants, is ordinarily null and void."

In *United States v. Darensbourg*, 520 F.2d 985, 987 (5th Cir. 1975), the court

quoted with approval from *United States v. Sklaroff*, 323 F.Supp. 296, 315 (7

D.Fla. 1971):

> [T]he determining factor as to whether a search warrant
> describes the premises to be searched with sufficient
> particularity is not whether the description given is
> technically accurate in every detail but rather whether the
> description is sufficient to enable the executing officer to
> locate and identify the premises with reasonable effort
> and whether there is any reasonable probability that
> another premises might be mistakenly searched which is
> not the one intended to be searched under the warrant.

And in *United States v. Esters,* 336 F. Supp. 214, 219 (E.D Mich. 1972), the court

indicated that "[t]he test to be applied in this situation, however, is not whether the

officers had actual knowledge, but the test is whether they should have known that

the building was not a one-family home."

Finally, in *United States v. Harris*, 486 F.2d 1404 (6th Cir. 1973), the court

affirmed without an opinion a finding of the Northern District Court of Ohio (365

F. Supp. 261, 262 (1972)) "that the agents being aware of the facts and

circumstances surrounding the physical configuration of the residential dwelling

here in question and the fact that it was occupied by three distinct families, their

failure to particularly describe the place to be searched and thereafter searching the

entire building constitutes an illegal search and consequently an illegal seizure."

There are cases cited in the District Court's decision in Mr. Jackson's case, that lend support to an argument distinguishing "single family dwellings" from "single premises containing multiple occupants." See, e.g., *United States v. McLellan*, 792 F.3d 200 (1st Cir. 2015); *United States v. Hinds*, 856 F.2d 438 (1st Cir. 1988); *United States v. Ayers*, 924 F.2d 1468 (9th Cir. 1991); *United States v. Schwinn,* 376 F. App'x 974 (11th Cir. 2010). *McLellan*, 792 F.3d at 212, however, points out that "[w]hether a dwelling constitutes a single- or multi-unit residence is a fact-intensive and situation-specific determination, and thus there are no hard-and-fast rules as to what category any particular dwelling falls into." These cases have unique factual circumstances that distinguish them.

*Hinds* was a large-scale drug conspiracy case where a DEA Agent was acting in an undercover role and provided facts suggesting that Hinds and others within what appeared to be a single-family home of the Letren family were involved. Only after the police began the search were they aware that Hinds resided on the top floor of the home. With little discussion, the Court found that there was probable cause to search the entire house and, after arrival and viewing the interior of the building, the scope of the search was proper.

*Ayers* was another drug investigation where there was probable cause to believe Eric Ayers was selling cocaine out of the home he shared with his parents. Citing *United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir. 1985), the *Ayers*

Court said, 924 F.2d at 147, that "a warrant is valid when it authorizes the search of a street address with several dwellings if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect." On arrival for the search of the house, despite recent corroboration of Eric's living in the house, his mother indicated that he had moved. The Court found that the officers did not have to believe the statement, and that the search of the house, including the search of Eric's father's bedroom where they discovered $470,000 in cash, was appropriate.

*Schwinn* and *McLellan* involved child pornography investigations. In *Schwinn*, *supra*, the downloading of child pornography was traced to Unit 302 of a building for which a search warrant was obtained. Prior to the search, officers interviewed a neighbor and were told that a man and a woman lived in the unit. After they arrived to execute the search warrant, Schwinn told them that there were three bedrooms, one of which he rented to Willie. That bedroom was locked and the police did not search it. A second bedroom was used for storage and nothing of importance was located in it, but the lower court suppressed those items. The Court found that probable cause existed to search the unit.

In *McLellan*, a website that had downloaded child pornography was traced to St. Ives at 180 High Street. The police confirmed that address as St. Ives's residence. The mailbox indicated St. Yves and two others, Keller and Theobold,

lived there.  On arrival of police, St. Ives and McLellan were present.  St. Ives told

police that he and Keller owned and occupied the residence, and that they had

recently rented the bedroom where Theobold previously resided to McLellan.  The

Court, 792 F.3d at 212, citing *Ayers*, said that "a warrant for a single-unit residence

authorizes the search of the entire dwelling regardless of who the area being

searched belongs to, so long as the items delineated in the warrant could

reasonably be found in the searched area."  Information obtained from St. Ives

prior to the search increased the likelihood that McLellan was the offender.

Therefore, the Court said the child pornography sought could reasonably be found

in his bedroom.

These cases rely more on the relationship of those occupying the address and

the individual facts of each case, rather than a rule clearly delineating a single-

family residence from a multi-unit building.

In Mr. Jackson's case, the affidavit for the search warrant stated the

premises to be searched were multiple buildings—a church and a rectory—with no

showing of any investigation or attempt to narrow down the visitor, employee, or

priest who might have used the internet address assigned to the entire property to

view the pornography.  The minimal facts contained within the affidavit for the

search warrant established that the application requested a search of multiple

private residences of priests and offices of priests and administrators for the

church.  There was, therefore, a lack of particularity in the warrant for which of the

dwellings of residents and offices of priests and administrators was to be searched.

Also, because the warrant included all computers, cellphones, and electronic

devices that *belonged to the various multiple residents and administrators located

in the rectory*, there was a lack of particularity and probable cause for the items to

be seized.  The result was a general warrant allowing the search of the offices and

residences of multiple priests and administrators and the seizure of many items

belonging to multiple parties, not limited in any way to a potential suspect.  Instead

of a search based on probable cause, this was a search to obtain probable cause.

"At the very core [of the Fourth Amendment] stands the right of a man to

retreat into his own home and there be free from unreasonable governmental

intrusion."  *Silverman v. United States*, 365 U.S. 505, 511 (1961).  Priests are not

roommates.  While priests may share some parts of the rectory with each other,

church employees, and parishioners, each has their own private living area.  The

first floor of the rectory was shared with others, e.g., a common kitchen, dining,

and living rooms, two offices for work and meetings, and an office for the

administrator.  The second floor was reserved for the residents and included living

and working areas for three priests, e.g., each priest had a bedroom, an area to

work, and a bathroom, although one bathroom was shared by two associate priests.

The officers in this case knew there was more than one priest residing in the rectory (the search warrant refers to "residents"), but they did not narrow the search to any occupant (the target of the search warrant was listed as "unknown"). In *Garrison,* 480 U.S. at 85, the Court said, "[p]lainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant." In this case, the size of both the church and the rectory, information contained on the website, and information stated in the church bulletin readily supported the existence of multiple residents, a fact stated in the warrant affidavit.

Moreover, police awareness of multiple residents was further confirmed when they executed the warrant and ascended to the second floor of the rectory. However, they did not stop the search then, as they should have if they made a reasonable mistake in assuming a single resident.[2]  See *Garrison*, 480 U.S. at 87-88 and n.13; *United States v. Ricciardelli*, 998 F.2d 8, 17 n.10 (1st Cir. 1993). Rather, they continued searching for every type of electronic device that could store information belonging to every resident and employee of the church, which was allowed by the broadly worded warrant.

---

[2] Of course, there was no mistake made here because the officers were well aware in advance that there were multiple residents living the rectory, as listed in the warrant affidavit.

Priests are entitled to privacy like other citizens. Perhaps their calling and service to others provide less privacy in some ways—they do not live in private houses with locked community gates, or sometimes even locked apartments. Indeed, the circumstances of their daily lives make privacy dearer. The living situation of priests is akin to rooming houses where economically disadvantaged tenants share some areas, such as kitchen, dining, or living areas, but have their own private bedrooms or living space. Less expensive accommodations do not diminish the constitutionally protected privacy of the individual in his private spaces. See *Hinton,* 219 F.2d at 325:

> Federal courts have consistently held that the Fourth
> Amendment's requirement that a specific "place" be
> described when applied to dwellings refers to a single
> living unit (the residence of one person or family). Thus,
> a warrant which describes an entire building when cause
> is shown for searching only one apartment is void. [citing
> cases]

Rather than trying to narrow the search, the government argued that it had probable cause for the entire area serviced by the internet (both the church and the rectory), which allowed police to search multiple living areas *because* they had not narrowed the search to a particular individual. See *United States v. Higgins*, 428 F.2d 232 (7th Cir. 1970), as an example of a case where such an argument was unsuccessful. Indeed, such an argument is the equivalent of claiming that police who know that alleged child pornography files were downloaded to one of many

devices on a single internet service for an entire apartment building or for a dormitory can search every apartment or dorm room within the building *because* they did *not* know which residence was downloading the files.  See *In re Bittorrent Adult Film Copyright Infringement Cases*, 296 F.R.D. 80, 85 (E.D.N.Y. 2012).

Expediency does not negate the constitutional particularity requirement. Probable cause is required for the particular place to be searched and the things to be seized.  The breadth of the search allowed by the warrant, both as to the multiple residences to be searched and the items to be seized (belonging to different residents), for the purpose of thereafter searching them over a period of time anticipated to be several months, treats the particularity clause as a constitutional necessity that may be disposed of based on expediency.

**B.  The Items to be Seized**

In *Marron*, 275 U.S. at 194, a 1927 case arising during prohibition, the search warrant described the things to be seized as "intoxicating liquors and articles for their manufacture."   They searched the location and found large quantities of liquor, some of it in a closet.  While in the closet, the officers noticed a ledger showing inventories of liquors, receipts, expenses, including gifts to police officers, and other things related to the business.  They also found beside a cash register a number of bills to Marron for gas, electric, water and telephone service furnished to the location.  The officers seized the ledger and the bills.  The Court

found the seizure of the ledger and the bills violated the particularity clause because they were not listed in the warrant.

In another nearly century-old case, the First Circuit invalidated a warrant that failed to include even a generic description of the property to be seized. In *Rice v. United States*, 24 F.2d 479, 480 (1st Cir. 1928), the court overturned a warrant authorizing an agent "to search and ascertain if any fraud upon the internal revenue service has been or is being committed in or upon or by use of said premises." Such cases no doubt led to the current practice of listing every conceivable, imaginable item of evidence in the affidavit for the warrant and in the warrant itself. Attachments A and B to the affidavit in this case exemplify the current practice.

More recent cases have addressed the more relevant problems that are today associated with the particularity clause. In *Klein*, *supra*, an F.B.I. Agent submitted an affidavit reporting that a salesman for Warner Communications furnished him with an 8-track tape that was labeled "Jethro Tull War Child," produced by "Bonanza Productions," which he had purchased from "D and L Limited." The agent also met with a district sales manager of Warner, who produced another 8-track tape entitled "Jethro Tull War Child," which he identified as being a genuine tape produced by Warner. Both tapes were played and found to be identical. An attorney for Warner told the agent that a copyright certificate was issued to Warner

for that tape and that Warner had not authorized Bonanza or anyone else to reproduce any part of the Jethro Tull tape.

The F.B.I. Agent then went to D & L Limited and purchased an 8-track tape entitled "Helen Reddy Free and Easy." While in the store, he "noticed approximately 500 or more 8-track tapes which, based upon my previous experience in this area, appeared to be unauthorized reproductions of commercial copyrighted tapes." He then spoke with an attorney for Capitol Records who advised that Capitol held the copyright certificate for that tape and had not authorized anyone else to reproduce it. The Agent then obtained an authorized production from Capitol and compared it to the tape from D & L, and the two tapes sounded identical.

The warrant authorized the agent to search D & L and to seize "certain 8-track electronic tapes and tape cartridges which are unauthorized 'pirate' reproductions and also any documentation and advertising materials relating thereto." Since neither the warrant nor the affidavit specified how the "pirate" tapes were to be identified, the defendants asserted that the warrant is an illegal "general warrant" and that the tapes seized must be suppressed. The Court, *Klein*, 565 F.2d at 186, stated:

> The present warrant does not have all the indices of a general warrant. It is limited to a search of a particular place and to particular items, that is, certain eight-track tapes and cartridges located at D and L. Neither the

warrant nor the affidavit, however, sets out clear
standards which assure the magistrate that the executing
officer will be able to differentiate a pirate reproduction
from a legitimate eight-track tape.  Although Agent
Saraceni recounted that, based on his experience, he had
"noticed approximately 500 or more 8-track tapes [in the
store] which . . . appeared to be unauthorized
reproductions of commercial copyrighted tapes," his
affidavit does not reveal the basis of his experience or the
means by which an executing officer could identify the
tapes. [footnote omitted].

Therefore, the affidavit presented the magistrate with nothing more than a generic

description of the items to be seized.  The Court reframed the issue as whether the

generic description of a pirate tape is sufficient to meet the particularity clause of

the Fourth Amendment.

The Court found the affidavit and the warrant failed to provide any *before*

*the fact guidance* to the executing officers *as to which tapes* were pirate

reproductions, and, therefore, could be seized under the authority of the warrant.

The two bases revealed to the magistrate to determine which were pirate tapes

were comparing the seized tapes to the authorized reproduction to see if they were

identical, and investigating the holders of the copyrights to see if the suspect tapes

were authorized.  Such an investigation could occur only after seizure.  The court

pointed out that "[w]hile the level of particularity required in a warrant may

decline when there is reason to believe that a large collection of similar contraband

is present on the premises to be searched, there must be specific and detailed foundation for such a belief." There was none presented in the affidavit.

Because the affidavit and the warrant failed to provide any before the fact guidance for the officers executing the warrant as to which tapes to seize as pirate tapes, there was a violation of the particularity clause and a substantial and unjustifiable likelihood of a violation of personal rights.

In Mr. Jackson's case, Attachment A of the Affidavit (Add. 26) lists a smorgasbord of every conceivable electronic device. Entire libraries can be contained within a small computer or a single cell phone. Small storage devices have enormous capacities. Yet every electronic device contained in multiple buildings, including a church open to the public, the church offices of employees, and the residences of priests, were listed to be seized, without narrowing down the owner or keeper of the information, or the device used. Because of the amount of information, as explained by Attachment B of the Affidavit (Add. 28), the government proposed to seize it all and take "weeks or months" to have experts search through the materials for evidence of "child pornography." The argument is *not* that the exhaustive listing of the items to be seized is improper if limited to a particular suspect; *rather,* it is that such a seizure and search of electronic devices belonging to a number of people, with no probable cause shown for each of them, results in a lack of particularity invalidating the warrant.

"Some [] IP addresses could belong to businesses or entities which provide access to its employees, customers and sometimes (such as is common in libraries and coffee shops) members of the public." *In re Bittorrent Adult Film Copyright Infringement Cases*, 296 F.R.D. at 85. Commercial airplanes and buses also provide internet access. While these searches do not involve residences, there could still be a particularity problem with regard to searching the items to be seized, if all employees, patrons, or customers of the business can be searched without narrowing the search by listing the suspect.

One internet address serviced the church and the rectory. The government argues that this allowed the seizure of devices belonging to all employees and residents with no investigation to narrow down the items to be seized by listing a known suspect. The search thereafter of all items seized was estimated to take months. There was simply a lengthy generic listing of all things digital or electronic, without any attempt to narrow down the items to be seized to a suspect, all of which would then be subjected to additional exploratory searches to locate the suspected child pornography among the many items belonging to multiple people. The Fourth Amendment was written to provide protection from such investigatory seizures of countless items belonging to multiple people in order to engage in an exploratory search that could provide probable cause to facilitate an arrest.

## C.  First Amendment Concerns

If the common living situation of priests residing in rectories allows a lesser governmental showing of particularity or probable cause to search their residences, then, in addition to the Fourth Amendment, First Amendment protections (the freedom of religion, perhaps the right to assemble, and possibly freedom of speech) may also be affected.  As pointed out in *Klein*, 565 U.S. at 189, since *Steele v. United States No. 1*, 267 U.S. 498 (1925) (a prohibition case where "cases of whiskey" was listed as the items to be seized), "the Supreme Court has only indirectly confronted the constitutional propriety of generic descriptions.  When the issue has been raised, it has been in the context of the First Amendment where free speech issues predominate." (citing *Stanford v. Texas*, 379 U.S. 476 (1965), and *Marcus v. Search Warrant*, 367 U.S. 717 (1961)).

In *Stanford,* 379 U.S. at 477-479, the property to be searched was "described as two white frame houses and one garage, located at the address of 1118 West Rosewood, … and being the premises under the control and in charge of John William Stanford, Jr.," which was where the petitioner resided and carried on a mail order book business under the trade name "All Points of View."  The items to be seized were listed as "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas." *Id*.  The Court found the warrant was a forbidden

general warrant in violation of the particularity clause of the Fourth Amendment.
*Id.*, 379 U.S. at 480-481.

The *Stanford* decision began with a description of the historical background
of the Fourth Amendment, citing a remark in *Marcus*, 367 U.S. at 724, that "[t]he
use by the government of the power of search and seizure as an adjunct to a system
for the suppression of objectionable publications is not new."  The Court then
quoted from the dissenting opinion of Justice Douglas in *Frank v. Maryland*, 359
U.S. 360, 376 (1959), where, with regard to the First, Fourth, and Fifth
Amendments, it was stated that "[t]hese three amendments are indeed closely
related, safeguarding not only privacy and protection against self-incrimination but
'conscience and human dignity and freedom of expression as well.'"  The Court
then held, *Stanford*, 379 U.S. at 486:

> We need not decide in the present case whether the
> description of the things to be seized would have been
> too generalized to pass constitutional muster, had the
> things been weapons, narcotics or "cases of whiskey."
> See *Steele v. United States No. 1*, 267 U.S. 498, 504.  The
> point is that it was not any contraband of that kind which
> was ordered to be seized, but literary material—"books,
> records, pamphlets, cards, receipts, lists, memoranda,
> pictures, recordings and other written instruments
> concerning the Communist Party of Texas and the
> operations of the Communist Party in Texas."  The
> indiscriminate sweep of that language is constitutionally
> intolerable.  To hold otherwise would be false to the
> terms of the Fourth Amendment, false to its meaning, and
> false to its history. [footnote omitted].

In *Marcus, supra*, the appellants were a wholesale distributor of magazines, newspapers, and books and the operators of five retail newsstands.  On the basis of the determination by an officer that magazines sold by the newsstands were "obscene" and thus subject to seizure under applicable law, six search warrants were issued authorizing officers to search each of the locations for obscene materials.  Finding the state procedures deficient in techniques to prevent erosion of constitutional guarantees, they were found to be in violation of the due process clause.  The Court stated, *id.*, 367 U.S. at 732:

> It is no reflection on the good faith or judgment of the officers to conclude that the task they were assigned was simply an impossible one to perform with any realistic expectation that the obscene might be accurately separated from the constitutionally protected.  They were provided with no guide to the exercise of informed discretion, because there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity.

Justices Black and Douglas concurred, stating that "[s]ince the State has used a general warrant in this case in violation of the Fourth and Fourteenth Amendments, I concur in reversal of the judgment." *Id.*, 367 U.S. at 739.

Of course, since many of the above cases were decided, digital files, such as those regularly searched online by the legal profession, have replaced books, magazines, newspapers, documents, photographs, and even entire libraries.  As more recently stated in *Andresen v. Maryland,* 427 U.S. 463, 482 n.11 (1976):

> We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the "seizure" of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.

The search of multiple priests' residences in rectories is different than the typical case where an identified person's IP address for a residence is involved. The search of rectories presents the need for regulation of searches that do not particularly describe the location to be searched and the items to be seized when dealing with multiple buildings, residents, and employees, and many electronic devices belonging to multiple individuals containing massive amounts of digital information.

## D. Alternative Solutions

As recognized by the District Court's decision in this case (Add. 13-15), courts and legislatures have been increasing the constitutional regulation of searches for electronic evidence, providing additional safeguards, e.g., wiretapping statutes and cases, and cases restricting the use of cellphone site location and GPS information. See, e.g., *Carpenter v. United States*, 138 S.Ct. 2206 (2018). The

result of the decision here is a retrenchment from the trend, allowing evidence seized from all electronic devices located in several private residences, in violation of the particularity clause, which requires a showing of probable cause for the residence of *each priest* living within the multiple-resident rectory building.

Rather than relying on ignorance of the offending suspect's identity and the specific location of his private residence, when facing a search of multiple residences, is it too much to require additional investigation by the police to narrow the search? Does it require too much to ask the police to question the suspects or potentially knowledgeable persons attached to the premises? They had four recent dates and times in September and October 2021 when the IP address of the router was downloading child pornography. Perhaps all resident priests were not on site at each of these times, or their location elsewhere could be established. While it may be inconvenient to require additional governmental investigation, the protections provided by the Constitutional provisions of the Bill of Rights were designed to limit governmental intrusion on individual privacy. There is no rational reason to limit the individual rights and privacy of priests.

While not necessary for the invalidation of the search that occurred in this case, there may have been alternative options for the police, such as narrowing the search and seizure by a less intrusive investigation. One possibility could be the seizure and search of the internet router for the IP address assigned to the parish in

order to determine the MAC (Media Access Control) address of the computer or individual electronic device that was connected to the targeted router IP address at the four specific times when police knew child pornography was being shared using that address. A procedure for seizure and search of the router might include temporary detention of identified electronic devices to avoid destruction of evidence while obtaining a warrant to seize and search the specific electronic devices disclosed by examination of the router.

As an example of possibilities, in *United States v. Stanley*, 753 F.3d 114, 115-118 (3rd Cir. 2014), cert. denied, 135 S.Ct. 507, police were informed of the IP address of a router downloading child pornography. A search warrant was obtained to allow the search of the home with the IP address, but the computers at that home contained no child pornography. The police suspected that the downloading computer was connecting to the router from a nearby location. The owner of the router allowed the police to connect a police computer to the router in order to determine the MAC address of other devices wirelessly connecting to the router. The IP address and the MAC address of the "mooching" computer were discovered. Rather than checking the discovered IP address for a location, the officer decided to use a "MoocherHunter" device and the MAC address to determine this computer's location. The MoocherHunter is a mobile tracking software tool that can be downloaded for free from the manufacturer's website and

used by anyone with a laptop computer and a directional antenna.  After entering

the MAC address of the mooching computer, the program measures the signal

strength of the radio waves of the desired device.  The readings increase as the user

aims the antenna in the direction of the mooching computer and moves closer to its

location.  Using the device, police determined that the location of the interloper

they sought was a particular apartment in a 6-unit building across the road.  A

search warrant was obtained for the computer in that apartment, on which they

found child pornography.  See also *Commonwealth v. Martinez,* 476 Mass. 410,

420 at n.10, 71 N.E.3d 105, 115 at n.10 (Mass. 2017), discussing similar

possibilities.

Another potential alternative to a general warrant could involve a Network

Investigative Technique (NIT) discovered by the government that allows the use of

software to implant code on an internet server allowing the disclosure of specific

individual addresses of computers downloading child pornographic images from a

provider.  The procedure is discussed in *United States v. Levin*, 874 F.3d 316, 318-

320 (1st Cir. 2017).  A next generation NIT may advance with the development of

the ability to use such a technique without seizing and employing the software

directly on the server or a copy of the server.  Or, perhaps the government could

obtain a warrant allowing the covert installation of an NIT, which would report the

IP address of the downloading computers.  Then a search warrant would be

obtained for the IP addresses involved.

## II. THE OBJECTIVE GOOD FAITH DOCTINE DOES NOT APPLY BECAUSE THE WARRANT IS SO FACIALLY DEFICIENT IN ITS FAILURE TO PARTICULARIZE THE PLACE TO BE SEARCHED AND THE THINGS TO BE SEIZED, AND IS SO LACKING IN INDICIA OF PROBABLE CAUSE AS TO RENDER OFFICIAL BELIEF IN ITS EXISTENCE ENTIRELY UNREASONALE.

When reviewing a finding that police acted in good faith, the district court's

"ultimate determination as to whether the executing officers acted in objectively

reasonable reliance on a defective warrant is reviewed de novo."  *United States v.*

*Zayas-Diaz*, 95 F.3d 105, 114 (1st Cir. 1996).  See also *United States v. Monell*,

801 F.3d 34, 38 (1st Cir. 2015); *United States v. Kearney*, 672 F.3d 81, 89 (1st Cir.

2012).  Any findings of fact are reviewed for clear error.  *United States v.*

*Woodbury,* 511 F.3d 93, 96 (1st Cir. 2007).

In *United States v. Leon*, 468 U.S. 897, 922-925 (1984), the Court

established the "objective good faith" doctrine that applies to an officer who

obtains and relies on a search warrant.  The Court, however, pointed out that

exclusion of evidence remains appropriate in several situations where an officer

may not rely on a magistrate's determination of probable cause.  Two of those

situations apply in Mr. Jackson's case.  As explained in *Leon,* 468 U.S. at 923, "[a]

warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be

searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts v. Sheppard,* [468 U.S.] at 988-991." See also *Groh*, 540 U.S at 561 n. 4, 565. The exception has been recognized in First Circuit cases. See, e.g., *Ricciardelli*, 998 F.2d at 15; *United States v. Fuccillo*, 808 F.2d 173, 177-178 (1st Cir. 1993); *Zayas-Diaz*, 95 F.3d at 113; *Levin*, 874 F.3d at 322.

The second applicable exception mentioned in *Leon,* 468 U.S. at 923, was as follows:

> Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S. [590, 606], at 610-611 [(1975)] (Powell, J., concurring in part); see *Illinois v. Gates,* [462 U.S. 213, 246], at 263-264 [(1983)] (White, J., concurring in judgment).

In Mr. Jackson's case, the enormous breadth and scope of the listed "place to be searched" (multiple residences and offices) and the "items to be seized" (many electronic devices belonging to several different people) violated the particularity clause as shown in Argument I above, making the warrant facially deficient. Also, official belief in the existence of probable cause within the affidavit for all of the residents of the rectory and all of their electronic devices would be "entirely unreasonable."

*Garrison*, 480 U.S. at 84, explained that the purpose of the particularity requirement was to limit the authorization to search to the specific areas and things for which there is probable cause to search.  The search that took place in Mr. Jackson's case was for every conceivable electronic device imaginable that might be found in multiple buildings, including a church open to the public, the church offices of employees, and the residences of priests, without narrowing the search by naming a suspect or the device used.  Rather, the government proposed to seize all items listed on their lengthy generic list and take "weeks or months" to have experts search through the materials seized for evidence of "child pornography." The fact that an internet address serviced the buildings did not provide an objectively reasonable belief that probable cause existed for such an exhaustive search without any attempt to "particularly describe" the place to be searched and the items to be seized.

The affidavit in support of the warrant indicated that the internet address was password protected, which might suggest the culprit was more likely to be one of the employees or priests, although organizations and businesses sometimes provide passwords to its customers or visitors.  With multiple priests and employees in the offices and residences in the rectory, the warrant essentially allowed a seizure of many devices belonging to multiple residents and workers in order to conduct an

exploratory search to determine which, if any, employee or resident might have been the one accessing child pornography.

"Th[e] good faith exception . . . is grounded in an objective standard of reasonableness.  As a result, an officer is required to have a 'reasonable knowledge of what the law prohibits.' [*Leon*,] at 920 n.20."  *Fuccillo*, 808 F.2d at 177.  In *Groh,* the Court dealt with the issue of qualified immunity for a police officer, although the Court explained that "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer."  (citing *Malley v. Briggs*, 475 U.S. 335, 344 (1986)).  *Groh*, 540 U.S. at 563-564, stated:

> Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid.  See *Harlow v. Fitzgerald*, 457 U.S. 800, 818-819 (1982) ("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct").  Moreover, because petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid.  Cf. *Sheppard*, 468 U.S. at 989-990.  In fact, the guidelines of petitioner's own department placed him on notice that he might be liable for executing a manifestly invalid warrant.  An ATF directive in force at the time of this search warned: "Special agents are liable if they exceed their authority while executing a search warrant and must be sure that a search warrant is sufficient on its face even when issued by a magistrate."  Searches and Examinations, ATF Order 0 3220.1(7)(d) (Feb. 13, 1997).

In *Levin*, 874 F.3d at 322, the Court stated:

> "[T]he deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue. When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis* [*v. United States*], 564 U.S. [229,] 238 [(2011)], … (quoting *Herring v. United States*, 555 U.S. 135, 143-44 … (2009).

The officer's reliance on the affidavit and the warrant, indicating they would be searching multiple residents in the rectory and seizing many electronic devices belonging to multiple residents and employees, was in reckless violation of the particularity clause of the Fourth Amendment. "Government agents may not trespass beyond the bounds of well-delineated Fourth Amendment procedures and then attempt to blunt the effects of their perorations by foisting the blame on the magistrate." *Ricciardelli,* 998 F.2d at 16. "Where the omission of a key ingredient [(the particularity required by the Fourth Amendment or probable cause to seize the particular item)], known to the law enforcement officers, leads to the subsequent invalidation of the warrant, the government faces a high hurdle in seeking to show objective good faith." *Id.*, at 16-17. They agents did not do so in this case.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should reverse the decision of the trial judge denying the motion to suppress and remand the case to the District Court.

## <u>STATEMENT OF COMPLIANCE WITH FED. R. APP. P. 32(a)</u>

I, the undersigned counsel, hereby certify:

1. That this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,927 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2. That this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, in New Times Roman, 14-point font.

Respectfully submitted,

/s/ John L. Calcagni III, Esq.
Counsel for Appellant

JOHN L. CALCAGNI III, ESQ.
LAW OFFICE OF JOHN L. CALCAGNI, III, INC.
72 Clifford Street, Third Floor
Providence, RI 02903
P. 401.351.5100
F. 401.351.5101
jc@calcagnilaw.com

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that the Brief for Appellant-Defendant, James W. Jackson, was filed with the Clerk, United States Court of Appeals for the First Circuit, through the ECF system, and was sent electronically to the registered Participants listed below as identified on the Notice of Electronic Filing (ECF) on April 5, 2024.  I further certify that once the Brief is accepted by the Court, nine (9) copies will be sent to the Clerk, United States Court of Appeals for the First Circuit, by first-class U.S. mail, postage prepaid, addressed to Clerk of Court, U.S. Court of Appeals for the First Circuit, 1 Courthouse Way, Suite 2500, Boston, Massachusetts 02210-3002.

      I further certify that once the Brief is accepted by the Court, I will cause a copy of the Brief to the following:

Kevin Love Hubbard
U.S. Attorney's Office
1 Financial Plaza
17th Floor
Providence, RI 02903-0000

Lee H. Vilker
U.S. Attorney's Office
1 Financial Plaza
17th Floor
Providence, RI 02903-0000

John P. McAdams
U.S. Attorney's Office
1 Financial Plaza
17th Floor
Providence, RI 02903-0000

Lauren S. Zurier
US Attorney's Office
1 Financial Plaza
17th Floor
Providence, RI 02903-0000

Respectfully submitted,

/s/ John L. Calcagni III, Esq.
Counsel for Appellant
JOHN L. CALCAGNI III, ESQ.
LAW OFFICE OF JOHN L. CALCAGNI, III, INC.
72 Clifford Street, Third Floor
Providence, RI 02903
P. 401.351.5100
F. 401.351.5101
jc@calcagnilaw.com